UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

RORY MAZUR,

                Plaintiff,                Case No. 5:05-CV-85

v.                                        HON. GORDON J. QUIST

WAL-MART STORES, INC., d/b/a
WAL-MART SUPERCENTER STORE #1432,

                Defendant.
_____/

**OPINION**

      Plaintiff, Rory Mazur ("Mazur"), filed a complaint against Defendant, Wal-Mart Stores, Inc. ("Wal-Mart"), in state court, claiming employment discrimination and a hostile work environment under the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), M.C.L. 37.1201, *et. seq*. Wal-Mart removed the case to this Court based on diversity jurisdiction. Now before the Court is Wal-Mart's motion for summary judgment on Mazur's claims. For the following reasons, the Court will grant Wal-Mart's motion for summary judgment on both the employment discrimination and hostile work environment claims..

**I. Background**

      Wal-Mart is an Arkansas corporation doing business in Michigan. Mazur is a former Wal-Mart employee. Mazur applied for and obtained employment at a Wal-Mart store in Oceanside, California, and subsequently transferred to the Wal-Mart store located in Cadillac, Michigan. Mazur's claims arise from his employment at the Wal-Mart store in Cadillac.

In 1984, Mazur suffered a closed-head injury when struck with a 2 x 4. As a result of the injury, Mazur experienced a reduction in his cognitive abilities and suffered epileptic seizures. Prior to the injury, Mazur worked as a chef, a job he can no longer perform. Mazur takes medication to control his epilepsy and has not suffered any grand mal seizures since 1987, nor mini-seizures since the 1990s.

In 1999, Mazur obtained employment at Wal-Mart in Oceanside, California. Mazur applied for and was granted a transfer to Cadillac, Michigan in 2001. Mazur was involved in several incidents at the Cadillac Wal-Mart. Mazur began in the garden department, where he suffered at least two injuries. Mazur received a written reprimand because of these injuries. Mazur then worked in the toy, stocking, day maintenance, and, night maintenance departments.

While working night maintenance, Mazur was observed intentionally damaging towel dispensers by opening them with an unapproved tool. Mazur also frequently used improper products while conducting his maintenance tasks. Wal-Mart requires employees to use Wal-Mart provided supplies, known as "99 supplies," to perform maintenance duties. Employees may use only commercial supplies from the shelves ("commercial goods") if the 99 supplies are unavailable and the employee obtains prior approval from management. Mazur repeatedly violated this rule and was informed of his violations and instructed to follow Wal-Mart procedure.

Mazur also received a written reprimand and nearly had his employment terminated following an incident in December, 2003, when he threatened his supervisor. Mazur believed that fellow employees were "pulling his chain" by throwing his coat on the floor while he worked. Around this time, Mazur's supervisor, Mark Hamacher, posted a sign stating that employee clothing not properly stored would be taken to Goodwill. Hamacher informed Mazur of this verbally, to which Mazur responded with a threat that if Hamacher touched Mazur's clothing, Mazur would

2

physically harm him. The Wal-Mart store manager terminated Mazur's employment, but following Mazur's appeal to the district manager, Wal-Mart reinstated Mazur in January, 2004, with the understanding that another violation of Wal-Mart policy would result in termination.

Mazur's main duties on the night maintenance crew at Wal-Mart were cleaning the bathrooms and vacuuming the carpets. The night maintenance crew also scrubbed and buffed the floors with large, heavy, motorized machines. Mazur was not allowed to operate the scrubbers and buffer. Mazur asked Hamacher and the store manager for permission to operate the scrubbers and buffer but was denied. Mazur made an "Open Door" call to the Wal-Mart district manager, claiming that he was being discriminated against because he was not allowed to operate the machinery. The district manager referred Mazur to the store manager, who denied his request, citing his history of carelessness and disrespect for Wal-Mart property.

In March, 2003, Wal-Mart terminated Mazur for using commercial goods, rather than 99 supplies, to perform maintenance work in the bathroom. The decision to terminate was made by the store manager following an assistant manager's report of Mazur's actions. Hamacher did not have any input into the decision to terminate Mazur's employment. At the time of his termination, Mazur admitted that he knew he was not supposed to use commercial goods, that he had been confronted by a supervisor the previous week about the issue, and that he violated the policy by using commercial goods. Mazur has been unable to obtain employment following his termination from Wal-Mart.

## II. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

### III. Discussion

**A.     Employment Discrimination Claim**

To recover under the PWDCRA, a plaintiff must allege a prima facie case and prove "(1) that he is [disabled] as defined in the act, (2) that the [disability] is unrelated to his ability to perform his job duties, and (3) that he has been discriminated against in one of the ways delineated in the statute." *Kiely v. Heartland Rehab. Servs.*, 359 F.3d 386, 389 (6th Cir. 2004)(citing *Chmielewski v. Xermac, Inc.*, 457 Mich. 593, 602, 580 N.W.2d 817, 821 (1998)). When a plaintiff alleges discrimination using circumstantial evidence, the plaintiff must satisfy a burden shifting test. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Venable v. GMC*, 253 Mich. App. 473, 483, 656 N.W.2d 188, 194 (2002). If the defendant offers a nondiscriminatory justification, the burden shifts back to the plaintiff to prove that the defendant's proffered reason was a mere pretext for discrimination. *Id.*

**1.     Mazur has introduced sufficient evidence to show that he is disabled under the act.**

Wal-Mart contends that Mazur does not meet the qualification of being disabled under the PWDCRA and thus fails to show the first element of a prima facie case. The question of epilepsy

aside, the issue is whether Mazur's cognitive difficulties constitute a disability under the PWDCRA. Mazur presents enough evidence to raise a genuine issue of material fact as to whether his cognitive dysfunction substantially impaired his ability to think or learn. Mazur has offered sufficient medical reports and testimony demonstrating the effects of his cognitive deficiencies. Mazur presented a medical report prepared in 1989 for the purpose of a disability evaluation for social security. (Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. B.) That report concluded that Mazur had a mental deficiency "with a mental age of about 8.9 years according to the Shipley-Hartford Scale." Mazur had difficulty doing simple math during the examination and reported that when his chain of thought was interrupted, he "tends to forget whatever he was thinking or saying at the time."

Mazur presented a second medical report prepared post-termination in 2004, again for purposes of disability benefits. (Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. C.) Mazur informed the physician that he suffered from seizures, headaches, impaired gait and coordination, confused thinking, poor memory and concentration, and mild speech impairment. Mazur reported that because of his difficulty with numbers, he leaves all money management to his wife. The physician noted that Mazur's "stream of mental activity was somewhat slowed and blocked by cognitive deficits, and he had difficulty giving a coherent personal history." The physician observed:

> His gait and gestures were awkward, as was his speech pattern, similar to someone with mild cerebral palsy. He spoke in a slow, labored manner, appearing to have difficulty finding the right word and/or pronouncing it correctly. He had difficulty comprehending at times and was slow in formulating a response to questions.

The physician concluded, "It was not this examiner's impression that claimant was exaggerating his physical or psychological symptoms."

Mazur also submitted a "Work Activity Report," prepared in May, 2004, for social security disability benefits. This report contains the preparer's remarks that Mazur's "speech was a little

difficult to understand and his wife accompanied him [and] assisted with historical information." (Def.'s Br. Supp. Mot. Summ. J. Ex. N.) Mazur's "Function Report" for disability benefits, filled out by Mazur's wife on his behalf, conveys Mazur's own assessment of his cognitive deficiencies. (Def.'s Br. Supp. Mot. Summ. J. Ex. O.) Prior to the incident causing his injury, Mazur was employed as a chef. However, Mazur now rarely cooks because he "can't coordinate timing [and] speed." Mazur also noted, "I usually burn food because I forget to turn the fire down." Mazur reported that he performs chores, such as mowing the lawn, raking leaves, vacuuming, and cleaning dishes, but his "wife says I don't do it right sometimes." Finally, Mazur stated:

> I have a hard time getting the words I want to say out. I can't read much. I always have to ask how to spell things. Sometimes I can't say the words right. My wife fills out applications [and] forms because I don't read or write very good.

Mazur's wife conveyed some of Mazur's difficulties in the "Third Party" function report containing her observations of Mazur. *Id*. She stated that Mazur is slow performing chores and cannot perform tasks requiring multiple steps. Mazur's wife reported that it takes Mazur "8 times longer" than her to shop, which she does not understand. Mazur himself noted that when he goes shopping for his wife, she "always asks what took me so long." Mazur's wife indicated that Mazur has problems paying attention, and that he needs reminders to cut his nails or get a haircut. When asked to circle characteristics affected by Mazur's condition, his wife circled talking, hearing, seeing, memory, completing tasks, concentration, understanding, and following instructions. According to his wife, Mazur "was unable to report his bi-weekly unemployment report over the telephone as the computerized instructions were 'too fast' for him to understand as to which number to press." A fellow employee at Wal-Mart testified, "Rory talks really slow. He's hard to understand. He stutters.

And you had to really, really listen hard in order to understand a lot of what Rory is saying." (Bell Dep. at 32.)

The Sixth Circuit addressed an ADA claim of disability similar to Mazur's and determined that the cognitive deficiencies of the plaintiff constituted a disability, as the brain injury affected his mental skills and substantially impacted his ability to think and learn. *See Mulholland v. Pharmacia & Upjohn, Inc.*, 52 F. App'x. 641, 646 (6th Cir. 2002). When construing the meaning of the PWDCRA, "Federal courts' interpretations of the ADA's parallel provision are instructive." *Lown v. JJ Eaton Place*, 235 Mich. App. 721, 728, 598 N.W.2d 633, 637 (1999). Interpretations of the ADA's definition of the term "disability" are instructive here in interpreting that term under the PWDCRA.

### 2. **Mazur has introduced sufficient evidence to show that his disability is unrelated to his ability to perform his job**.

Mazur established the second part of the prima facie case by introducing job evaluations that demonstrate his ability to perform his job. Mazur worked at Wal-Mart for several years. Wal-Mart does not contend that Mazur's disability negatively impacted the performance of his job duties. In fact, Wal-Mart states that, although employees recognized that Mazur was slow and had some speech problems, it was unaware of Mazur's disability. (Def.'s Mot. Summ. J. at 2.)

### 3. **Mazur fails to establish that Wal-Mart discriminated against him in one of the ways set forth in the statute**.

The PWDCRA states that an employer shall not:

> Discharge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position.

M.C.L.A. § 37.1202(1)(b).

7

      **(a)**    **Mazur's claim of on-the-job discrimination**.

Mazur argues that his frequent transfer between departments shows a discriminatory intent by Wal-Mart. Mazur claims that these transfers were because of his disability and that other, non-disabled, employees received better treatment. Mazur, however, fails to offer any evidence that such transfers were based on discrimination, that he was treated differently, or that Wal-Mart did not have justification for transferring him between departments. Wal-Mart has shown that Mazur was injured twice while working in the garden department, which led to the decision to transfer him inside. Wal-Mart has also shown that Mazur accepted his transfer from the day maintenance crew to the night maintenance crew to satisfy his request for more hours. (Eldridge Dep.)[1]

Mazur has presented evidence that while he was on the night maintenance crew, he was assigned only the tasks of cleaning the bathrooms and vacuuming. Mazur asked his immediate supervisor and the store manager for permission to perform other maintenance tasks, specifically buffing the floors, but was denied his request. Mazur brought his concerns to the district manager by making an "Open Door" call, but his request was referred to the store manager where it was again denied. The depositions of Mazur and Wal-Mart employees indicate that the other members of the night maintenance crew rotated tasks. Mazur was trained to perform other tasks, but he was not permitted to scrub and buff the floor.

Wal-Mart offers several explanations for why Mazur could not use the scrubbers and buffer. First, Wal-Mart contends that concerns about Mazur's carelessness precluded him from being considered for tasks such as scrubbing and buffing the floors. Mazur was twice injured while working. Mazur injured his back while lifting goods and injured his mouth, breaking a denture,

---

[1] The pages of the Eldridge deposition were not numbered.

when he attempted to retrieve a product from a shelf above his head. Mazur received a written reprimand for his carelessness and failure to follow store procedure by not getting assistance to perform the task. Wal-Mart claims it transferred Mazur to a different department because of these injuries and his carelessness. Mazur argues that Wal-Mart treated him unfairly by giving a written reprimand and presents evidence that other employees injured on the job did not receive written reprimands. (Bell Dep. 37-39.)

Next, Wal-Mart claims that Mazur repeatedly damaged towel dispensers in the bathroom by intentionally opening them with a carpet tool rather than with the keys provided. This disregard for store property is cited by Wal-Mart as a key factor in the decision to not allow Mazur to operate the scrubbers and buffer. Mazur contends that he only opened the dispensers with a tool when the keys were missing. Wal-Mart did not formally reprimand Mazur for such acts.

Finally, Wal-Mart contends that Mazur was assigned to cleaning the bathrooms and vacuuming because the night maintenance supervisor utilized people to their strengths. Other employees, however, were rotated among the various maintenance jobs so that they would not get bored. Mazur was not rotated like the other employees, and Wal-Mart denied his requests to perform tasks other than cleaning the bathrooms and vacuuming. Wal-Mart contends that Mazur was not incorporated into the rotation because of his history of carelessness and disregard for store property. Wal-Mart also states that, in accordance with assigning people to their strengths, Mazur cleaned the bathrooms and vacuumed. Mazur himself stated that he was better at cleaning the bathrooms and vacuuming than other employees. (Mazur Dep. at 100.) Hamacher, the night maintenance supervisor, also reported basing his decision on who would handle the scrubbers and buffer on who had the most experience. Hamacher testified that he allowed the people who were on the night maintenance crew prior to his appointment as manager and Mazur's arrival on the staff to continue

9

operating the equipment because they were former supervisors and also had a lot of experience with the equipment. (Hamacher Dep. at 40-41, 45-46.)

Wal-Mart has shown that Mazur's history of injuries, carelessness, and lack of respect for store property led to the decision that Mazur should not operate the scrubbers and buffer. Mazur has not shown a discriminatory intent behind Wal-Mart's decisions. Mazur thus fails to present sufficient evidence to create a genuine issue of material fact that Wal-Mart discriminated against him regarding the terms, conditions, or privileges of employment.

### (b) Mazur's claim of discriminatory termination of employment.

Mazur attempts to use evidence of disparate treatment to show that his termination was because of discrimination. Under a theory of disparate treatment, "the plaintiff and the employee with whom the plaintiff seeks to compare himself must be similar in all of the *relevant* aspects" for the two to be considered similarly-situated. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in original) (internal quotation marks omitted). "Relevant factors for determining whether employees are similarly situated often include the employees' supervisors, the standards that the employees had to meet, and the employees' conduct." *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003) (citing *Ercegovich*, 154 F.3d at 352).

Wal-Mart terminated Mazur's employment for "Gross Misconduct - Integrity Issue" arising from his unapproved use of commercial goods for maintenance. Among the enumerated acts in that category are "Theft" and "Misappropriation of Company Assets." Mazur admits that he used commercial goods during the incident in question. Wal-Mart has shown that Mazur was on notice that one more violation of store policy would result in his termination. At the time of his termination, Mazur admitted his knowledge that he violated Wal-Mart policy.

Mazur argues that other employees who used commercial goods without prior authorization were not even reprimanded, much less terminated. Sandra Bell, a department manager, testified that there were several instances in which she and other employees would use shelf supplies without prior approval and, after such use, give the UPC to the store manager for record keeping purposes. (Bell Dep. at 17-19.) Bell stated that Wal-Mart did not have any problem with this procedure even though store policy required prior approval. Mazur also argues that although he received a written reprimand for getting injured on the job, Bell did not receive a similar punishment following an injury. (*Id*. at 37-38.)

Wal-Mart counters by arguing that Bell's conduct differed from Mazur's because Bell only used commercial goods without prior authorization when there were no 99 supplies available. (*Id*. at 26-27.) Mazur used commercial goods even though the 99 supplies were available. Wal-Mart also argues that Bell was a department manager, although it is unclear if she worked in this capacity at the time of her use of commercial goods without prior approval. At the time of Mazur's termination, Bell worked in a different department than Mazur and under different supervisors. Furthermore, Wal-Mart argues that because of past unauthorized uses of commercial goods, Mazur had been verbally put on notice that he was not to use commercial goods without prior authorization. Mazur did so anyway. These relevant aspects discredit Mazur's assertion that he and Bell were similarly situated for purposes of a disparate treatment theory.

Wal-Mart states that Mazur's termination was based in part on other on-the-job incidents. Wal-Mart previously attempted to terminate Mazur following an incident related to Mazur's coat. Mazur confronted Hamacher three days after Hamacher made a comment that Mazur's coat "was headed for Goodwill" if Hamacher found it on the floor one more time. Mazur told Hamacher that if he touched the coat again, Hamacher would "have a real big problem." Hamacher then asked

11

Mazur, "What kind of problem?" Mazur replied by saying Hamacher would "hurt when [he] found out." (Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. D.) Mazur was initially terminated, but the district manager subsequently allowed him to return to work, with the understanding that another violation of Wal-Mart policy would result in permanent termination. Mazur acknowledged to his supervisors when he was confronted using commercial goods that he knew his action violated store policy. Mazur was aware of the rules and voluntary violated them, even after receiving warnings and knowing that he was on probation, with one more incident resulting in a termination.

Mazur also argues that Wal-Mart's refusal to allow him to operate the scrubbers and buffer supports his argument that his termination was motivated by discrimination. Mazur failed to show that Wal-Mart discriminated against him based on his disability by not allowing him to operate that heavy equipment. Because Mazur fails to present enough evidence to demonstrate that Wal-Mart terminated Mazur based on his disability, thereby failing to establish a prima facie case, summary judgment on Mazur's discrimination claim is appropriate.

Finally, even if Mazur had established a prima facie case, the previous analysis applies equally to the burden shifting approach required to disprove Wal-Mart's legitimate, nondiscriminatory reason for Mazur's termination. As this Court has noted, "the employer's arguments that a plaintiff did not establish a prima facie case and the employer's non-discriminating explanation often merge." *Kresnak v. City of Muskegon Heights*, 956 F. Supp. 1327, 1336 (W.D. Mich. 1997). In the burden shifting approach, Mazur's arguments likewise would have failed to meet the burden of showing that Wal-Mart's proffered reason was mere pretext for discrimination.

**B.     Hostile Work Environment Claim**

In order to establish a prima facie case of hostile work environment, Mazur must prove that:

> (1) [he] belonged to a protected group; (2) [he] was subjected to communication or conduct on the basis of the protected status; (3) [he] was subjected to unwelcome conduct or communication on the basis of the protected status; (4) the unwelcome conduct or communication was intended to, or in fact did, interfere substantially with the employee's environment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.

*Downey v. Charlevoix County Bd. of Rd. Comm'rs*, 227 Mich. App. 621, 629, 576 N.W.2d 712, 716 (1998). Mazur does not show that he was subjected to communication based on his disabled status. Noes does Mazur show that any communication or conduct was intended to, or in fact did, interfere substantially with his environment or created an intimidating, hostile, or offensive work environment. In *Downey*, for example, the plaintiff met these elements by presenting deposition testimony of four employees who stated "that the working conditions . . . were so bad that several employees reported health problems directly attributable to the environment created by [supervisors]." *Id*. at 631. The plaintiff's claim was based on age discrimination and the comments and actions by the defendants that created the hostile work environment were based on the age of the plaintiff. The plaintiff suffered from depression and the supervisors also singled him out by making derogatory comments about his depression. There was also some evidence presented indicating that the work environment caused the plaintiff's depression. *Id*.

      Mazur does not offer any evidence that he was subjected to communication or conduct solely on the basis of his disability. Neither does Mazur show that the work environment intimidated him or affected him in a manner that substantially interfered with his employment. In support of his hostile work environment claim, Mazur cites comments made by unknown employees. Mazur recalls someone calling him "tidy-bowl man" because he cleaned the bathrooms. (Mazur Dep. at 103.) Mazur, however, stated that he does not recall anyone at Wal-Mart ever making comments or jokes to him about his physical or mental condition. Mazur believed that management and

employees laughed at him behind his back as he left the break room, but he cannot identify specific people or incidents. (*Id*. at 87, 89-90.) Mazur never confronted anyone or complained to management, because he is "not the person to go complain about – that makes them feel good." (*Id*. at 90.)

Mazur relies on Bell's testimony regarding comments made unbeknownst to Mazur. In particular, Mazur cites a comment made by Hamacher, who, while speaking to Bell, referred to Mazur as a "plate head." This comment was made out of Mazur's presence, and Mazur did not learn of the comment until informed by Bell after his termination. At his deposition, Mazur could not even recall who actually made the comment. (*Id*. at 77.) A statement made outside of Mazur's presence, and which Mazur did not learn of until after his termination, did not interfere with Mazur's work environment.

Bell testified that there were "a lot of comments made jokingly or non-jokingly of [Mazur]." (Bell Dep. at 10.) According to Bell, other employees "picked on" Mazur and gave him "a lot of crap basically," things that "they certainly would not have said to me." (*Id*. at 42.) She also stated that at least some of the teasing was merely joking between friends. (*Id*. at 10.)

The primary incident that Mazur cites for his hostile work environment claim involves his coat. Mazur believed that other employees were "pulling his chain" by throwing his coat on the floor while Mazur was working. (Mazur Dep. at 97-98.) Mazur never saw anyone throw his coat on the floor, but based on his placement of the coat when he arrived at work, he assumed that someone must have deliberately thrown it on the floor. Mazur claims that this repeated act is the reason he became upset at Hamacher when Hamacher threatened to take his coat to Goodwill. Mazur, however, fails to offer any evidence that discriminatory animus of employees was the reason he repeatedly found his coat on the floor.

14

Neither can Mazur meet the respondeat superior element. This element is met if the employee reports the conduct to superiors and they fail to take remedial measures or when the "employers perpetrated the conduct." *Downey*, 227 Mich. App. at 632, 576 N.W.2d at 717. Mazur stated that he never reported the alleged conduct or comments to management. Mazur does not show that Wal-Mart management was aware of any conduct or communication of Mazur's fellow employees creating a hostile work environment. Mazur also stated that he did not know who was making comments, as no one made comments to his face; he only felt like people were making comments about him. Mazur occasionally heard someone tease him about his chores, but never his disability. Even the comment made by Hamacher referring to Mazur as a "plate head" fails to satisfy this element because, although it was made by a superior, Mazur did not learn of the comment until after his termination, so it could not have contributed to creating a hostile work environment.[2] Other managers testified that they did not know of Mazur's disability, much less any conduct or communication directed towards Mazur based on his disability.

Viewing the evidence in the light most favorable to Mazur, Mazur fails to show that a hostile work environment existed or that Wal-Mart intended to create a hostile work environment. Therefore, Wal-Mart is entitled to summary judgment on Mazur's hostile work environment claim.

## IV. Conclusion

For the foregoing reasons, the Court will grant Wal-Mart's motion for summary judgment. An Order consistent with this Opinion will be entered.

Dated: October 24, 2006        /s/ Gordon J. Quist
                               GORDON J. QUIST
                               UNITED STATES DISTRICT JUDGE

---

[2] It is undisputed that Hamacher did not have input on the decision to terminate Mazur's employment.